**KRONENBERGER BURGOYNE, LLP**
Karl S. Kronenberger (Bar No. 226112)
Henry M. Burgoyne, III (Bar No. 203748)
Jeffrey M. Rosenfeld (Bar No. 222187)
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone:  (415) 955-1155
Facsimile:   (415) 955-1158
karl@KBInternetLaw.com
hank@KBInternetLaw.com
jeff@KBInternetLaw.com

Attorneys for Defendants Jesse Willms, eDirect, 1016363 Alberta, Ltd. and 1021018 Alberta Ltd.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CONSUMERINFO.COM, INC.,** a California corporation,<br><br>Plaintiff & Cross-Defendant,<br><br>v.<br><br>**JESSE WILLMS**, *et al.*<br><br>Defendants. | CASE NO. SACV09-0055 DMG (MLGx)<br><br>**DECLARATION OF KENT VAN LIERE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:       March 12, 2010<br>Time:      2:00 p.m.<br>Place:     Courtroom 7<br><br>Before Hon. Dolly M. Gee, Judge<br><br><u>**SELECTED EXHIBITS**</u><br><br><u>**SUBMITTED UNDER SEAL**</u> |
| **JESSE WILLMS** and **EDIRECT**,<br><br>Cross-Plaintiffs,<br><br>v.<br><br>**CONSUMERINFO.COM, INC.**,<br><br>Cross-Defendant. | |

CASE NO. SACV09-0055 DMG (MLGx)      **VAN LIERE DECL. ISO DEFENDANTS' OPP TO PLAINTIFF'S MTN FOR PARTIAL SJ**

I, Kent D. Van Liere, declare and state as follows:

1. I have been asked to opine as an independent expert in the fields identified herein and in my previous disclosures in this matter. I give the testimony stated herein of my own free will and any payments received for my work in this matter do not in any way depend on the outcome of this or any other legal matter or what I state in my declaration.

## Qualifications

2. I am a Vice President at NERA Economic Consulting ("NERA") where I participate in the Intellectual Property, Antitrust, Product Liability, and Securities Practices. My business address is 10955 Westmoor Drive Suite 400, Westminster, Colorado 80021. NERA is a firm providing expert economic, financial, statistical, and survey research analysis.

3. Among my responsibilities, I conduct market analysis, sampling analysis, and survey research on a wide range of topics regarding consumer decision making, consumer choice, and consumer behavior. In the course of my 30 year career I have conducted several hundred studies for leading corporations and government agencies involving studies of employees, consumers and businesses. I have published articles in leading peer-reviewed journals, as well as technical reports in which consumer attitudes, choices, and behavior have been the focus.

4. Prior to joining NERA, I served as a Principal, President, or Director of the market analysis and survey research practice for HBRS and Hagler Bailly for more than 15 years. I also served as President and CEO of Primen, a market intelligence firm that was a joint venture of the Electric Power Research Institute and the Gas Research Institute. Earlier in my career, I was a tenured Associate Professor at the University of Tennessee where I taught undergraduate and graduate level courses in statistics,

1  survey research methods, and social psychology. I also taught as a Visiting
2  Associate Professor at the University of Wisconsin. My courses were
3  regularly cross listed or recommended for students in the business school
4  as well as liberal arts. I hold a Ph.D. from Washington State University.

5       5.    I have substantial experience conducting and using focus groups
6  and surveys to measure consumer opinions and behaviors regarding
7  products and services including purchase processes, branding and
8  positioning, market segmentation, product attributes, new product research,
9  and communications strategies. During my career in academic and
10 commercial research, I personally facilitated hundreds of focus groups and I
11 have designed and analyzed hundreds of surveys focused on these
12 marketing related issues.

13      6.    With respect to litigation, I have designed and reviewed studies
14 on the application of sampling and survey research methods in litigation for
15 a variety of matters including trademark/trade dress infringement, secondary
16 meaning, misrepresentative/deceptive advertising as well as in matters
17 related to antitrust, mass torts, labor disputes and product liability. I have
18 provided deposition testimony and testimony at trial related to issues of
19 sampling, survey research, and statistical analysis.  A copy of my current
20 resume showing my publications in the past 10 years and testimony in the
21 prior 4 years is attached as Exhibit A.

22      7.    NERA is being compensated for my services in this matter at my
23 rate of $550 per hour. Other NERA consultants assisted me in this
24 engagement and are being compensated at rates less than $550 per hour.
25 No part of NERA's compensation depends on the outcome of this litigation.
26 Throughout this declaration, I have used the terms "I," and "my" to refer to
27 work performed by me and/or others under my direction.
28 //

## Documents

8. As part of my work, I relied upon the Complaint and Counterclaim filed in this lawsuit. I reviewed the application for trademark filed by Consumerinfo.com Inc., the United States Patent and Trademark Office's response to that application and the response papers filed by Consumerinfo.com. I also reviewed complaints made about FREECREDITREPORT.COM to the Better Business Bureau. A list of the specific materials I relied upon can be found in Exhibit B.

## Assignment and Summary of Conclusions

9. I was retained by counsel to design research to determine whether consumers are confused or mislead as to the meaning of FREECREDITREPORT.COM and specifically whether consumers, when shown a version of the FREECREDITREPORT.COM website, mistakenly believe that the services being offered were free and without obligation.

10. The study I designed used standard methods to test consumer perceptions of the FREECREDITREPORT.COM mark and the use of this mark on the FREECREDITREPORT.COM website. The study also had a control condition that assessed the rate at which consumers are confused or misled by elements of the website or the research design which are not at issue in this case. As part of my analysis, I calculated a measure of "net" confusion or the percent of consumers confused as to the misleading nature of the mark and its use on the website by subtracting the total confusion measured in the test condition from the total confusion measured in the control condition. In my study, the rate of net confusion is 19 percent.

11. Based on these results, I conclude that a significant portion of consumers in the relevant population is likely to be misled or confused by the mark FREECREDITREPORT.COM and its use in advertising on the site.

My study demonstrates that consumers are likely to be misled into believing that the website using this mark offers credit reports for free without fees and without obligation.

## Background

12. I understand that ConsumerInfo.com filed an original trademark application with the United States Patent and Trademark Office (USPTO) on February 20th, 2006 for the mark FREECREDITREPORT.COM. I further understand that the USPTO denied the original application on August 12, 2006.[1]

13. I understand that Plaintiff challenged this ruling and requested a re-examination. In its office action response dated February 12th, 2007, Plaintiff argued that they use FREECREDITREPORT.COM not just as an internet address but also as a brand. They explained the connection between the mark and the website thusly:

> "Since the launch of the website in 1999, Applicant always has placed the FREECREDITREPORT.COM mark on a prominent location on the website's homepage and on nearly every page of the site ... Visitors to the website see the prominent display of the mark on the site's pages each time they use the site and are reminded that the brand of the products and services they seek is indentified by the mark FREECREDITREPORT.COM,".[2]

Moreover, Plaintiff in response to the Office's concern that their mark would

---

[1] For application see, WILLMS000263-WILLMS000285 and for USPTO denial see, WILLMS000286-WILLMS000293.

[2] *Response to Office Action* dated February 12th, 2007, page, 4 (WILLMS000312).

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

CASE NO. SACV09-0055 DMG (MLGx)   4   VAN LIERE DECL. ISO DEFENDANTS' OPP TO PLAINTIFF'S MTN FOR PARTIAL SJ

cause confusion with an already existing mark stated that "FREECREDITREPORT.COM" is distinct from other marks because it uses the word "FREE":

> "Applicant's mark is different in sight, sound and meaning than the Cited Mark, and Applicant's use of the word "FREE" before "CREDITREPORT" creates an entirely different commercial impression than in the Cited Mark.[3]

In this regard, I understand that Plaintiff is claiming that the use of "FREE" as part of FREECREDITREPORT.COM is essential to the mark's distinctiveness.

14. I further understand that as part of the current case, Defendants have challenged the application for the mark FREECREDITREPORT.COM as deceptive, deceptively misdescriptive and fraudulently obtained and therefore not eligible for trademark protection.[4] Among other things, Defendants and Cross-Plaintiffs (hereafter "Defendants") claim that the Plaintiff's mark, at the time of its registration application as well as currently, confuses or misleads consumers into believing that they can receive a credit score or report with no obligation and no fees.[5]

15. Based on this understanding, I was asked to design research to measure the degree to which consumers are confused or misled that FREECREDITREPORT.COM offers credit scores or reports with no associated fees and no obligations. Further, since Defendants allege the

---

[3] *Response to Office Action* dated February 12th, 2007, page 7 (WILLMS000315).
[4] *Defendants and Cross-Plaintiffs Willms's and EDirect's Answer to Complaint and Counterclaim,* pages 19 - 24.
[5] *Defendants and Cross-Plaintiffs Willms's and EDirect 's Answer to Complaint and Counterclaim,* pages 22 - 23.

Plaintiffs mark and its use on its website were misleading and deceptive at the time of the registration, I have used a version of Plaintiffs website from that period of time.

## **Methodology**

16. The design of this research follows generally accepted principles for the design of false and misleading advertising or confusion studies[6] as described in any number of key treatises on the topic.[7] In general, the design of such a study requires careful attention to the following key areas:

- The definition of the relevant population;
- The procedures for sampling from the relevant population;
- The survey questions and interviewing procedures;
- The nature of the specific test and control stimuli shown to sampled consumers; and
- The protocol for estimating confusion.

The discussion in this section of the declaration is organized around these key areas.

---

[6] As McCarthy observes the test for confusion in a trademark infringement claim and false advertising claim are essentially the same, "Thus, the test of liability is likelihood of confusion. [FN2] As the Ninth Circuit observed: [U]nder the Lanham Act [§ 43(a)] the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks. ... Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical–is there a "likelihood of confusion"? [FN3]" McCarthy on Trademarks and Unfair Competition, Fourth Edition Database updated February 2008. Chapter 27:18 (hereafter "McCarthy.")

[7] See Diamond, S. (2000) " Reference Guide on Survey Research" in the *Reference Manual on Scientific Evidence Second Edition*, Federal Judicial Center at: http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf; Federal Judicial Center (2004); *Manual for Complex Litigation, Fourth.* Section 11.493, p. 102.

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

## Definition of the Relevant Population

17. In general terms, the relevant population for a false and misleading advertising case is usually defined as "... that segment of the population whose perceptions and state of mind are relevant to the issues in the case."[8] For this case, the relevant population can reasonably be understood as the group of United States consumers 18 years or older who have in the last 12 months or would in the next 12 months search online for information about credit scores or credit reports.

## Sampling of the Relevant Population

18. Sampling procedures were used that are typical in false and misleading advertising cases in which the consumers need to be shown visual stimuli. These procedures include conducting interviews at mall facilities in a widely distributed and relevant geographical area and using quota sampling to assure representativeness across a range of demographic groups.[9]

19. I selected ten separate cities representing the major census regions of the United States. Each city selected was able to accommodate our research needs.[10] The cities selected were Minneapolis, MN, Fort Worth, TX, Denver, CO, Boston MA, Nashville, TX, Jacksonville, FL, Seattle, WA, Detroit, MI, San Francisco, CA, Woodbridge, NJ/NY. The cities selected are a reasonable representation of the geographies across the U.S. where relevant consumers could be found.

---

[8] McCarthy at 32:159.

[9] McCarthy at 32:165.

[10] This included the ability to administer the survey using a computer linked to the internet, a room which would allow enough space for the interviewer's computer and a computer for the respondent and the ability to have staff monitor at least some portion of the interviews.

20. After selecting the malls, individual consumers needed to be sampled. Within the malls, sampled consumers were distributed throughout days of the week and across demographic quotas. First, interviews were split between weekday interviewing and weekend interviewing.[11] Interviewers were also instructed to distribute interviewing throughout the day. Second, quotas based on demographic characteristics were used to assure a reasonable representation of the diversity of consumers in the relevant population. Based on discussions with counsel, I determined that a reasonable demographic distribution would be to split the interviews equally between men and women. I also determined that the age distribution for those who either had or would be likely to look for information about credit scores and credit reports online would tend to roughly group into about 20 percent between 18 and 29 years of age, about 40 percent between 30 and 49 years of age, about 25 percent between 50 and 64 and about 15 percent for those 65 years of age or older. These proportions were used in the quotas assigned in each mall. Each interviewing facility was instructed to complete a minimum number of interviews in each of the age and gender quota cells to achieve the approximately desired proportions.

21. To ensure that respondents were part of the relevant population as defined for this case, a series of screening questions was asked. Copies of the screening and main questionnaire, as well as instructions provided to the facilities, are attached as Exhibit C.

22. Specifically potential respondents were asked a series of questions about information they would or have recently searched for online. Respondents were considered qualified for the interview if they had searched online in the past 12 months or would search online in the next 12

---

[11] Weekdays were defined as Monday morning through Friday afternoon and weekends were defined as Friday evening through Sunday evening.

months for information about credit reports and credit scores. [12]

23. The screener also ensured that individuals who needed glasses or contact lenses to read had them available for the interview and were willing to wear them. All qualified respondents had to be willing to provide a name and contact telephone number so that the interview could later be validated.

## Survey Questions and Interviewing Procedures

24. The studies described in this declaration are based on completed interviews with 390 respondents who met the screening criteria. These 390 respondents were randomly assigned to one of two conditions described below. The test condition had a total of 195 completed interviews and the control condition had a total of 195 completed interviews. The final interviews were divided between ten cities (approximately 40 respondents per city) and across the demographic categorization (by gender and age) as described previously.

25. Once the interviewer determined that the respondent was qualified, he or she was brought to the interviewing facility. Respondents were taken to a room with two computers. One computer was for the respondent to use and one for the interviewer to use to record respondents' answers. The interviewer and the respondent were stationed such that the interviewer could see the respondent's computer screen but the respondent could not see the interviewer's screen. As a first step, respondents were re-screened to ensure that the responses to the screening questions were

---

[12] As is generally standard practice in these types of studies, potential respondents were screened out of the study if they worked in market research or for a store in the mall. I also screened out those who worked for a company offering financial or credit services as these respondents would potentially have knowledge of the litigation at issue.

CASE NO. SACV09-0055 DMG (MLGx)       9       **VAN LIERE DECL. ISO DEFENDANTS' OPP TO PLAINTIFF'S MTN FOR PARTIAL SJ**

accurately recorded and that only qualified respondents were included in the study. Any respondent whose answers to the re-screening made them ineligible was screened out and not asked the main survey questions.

26. The interviewer then began the main survey process. The test or control condition to be seen by the respondent was selected randomly by the CAPI program on the interviewer's computer.[13] The interviewer instructed the respondent to open the appropriately numbered Internet Explorer icon on the desktop of the respondent's computer based on which condition was randomly selected (either condition 1 or condition 2). The interviewer was to watch and record the icon used by the respondent to provide an independent confirmation that the correct page had been opened.

27. The computer screen then showed the respondents a home page for a website. Respondents were told to look at the page as they normally would and that they could scroll up and down the page but that they were not to click on anything on the page. Respondents were allowed to take as much time as they'd like to look at the page and they were instructed to let the interviewer know when they were finished looking.

28. While looking at the search results, the respondent was first asked whether they had been to this site previously. Respondents were then asked "<u>What products or services do you think this website is advertising?</u>".

29. Any respondent who answered "credit report" or "credit score" was asked an additional question.[14] These respondents were asked, "<u>Do you think this credit report DOES or DOES NOT have any fees or obligations associated with it</u>?" The response options in the question rotated

---

[13] CAPI stands for "Computer Assisted Personal Interviewing" system.

[14] Respondents could also say "free credit report" or "free credit score" and were allowed to provide multiple answers to this question.

so that approximately half of all respondents were read the form "does or does not" and the other half were read "does not or does". The form was randomly assigned by the computer interviewing system.

30. Finally, all respondents answering the previous question were asked, "<u>What makes you say that</u>?".

31. At the conclusion of the questions, respondents were thanked for their time and were asked to provide their contact details.[15]

32. The interviews were conducted as double-blind studies; that is, neither the interviewers nor the respondents were aware of the purpose of the research. Special care was used in writing the survey instructions so that the intent of the research was not disclosed to facility supervisors, interviewers or the respondents.

33. All completed interviews were called to validate their participation in the interview. Any interviews that did not validate were excluded from the final data.

### The Test Stimuli

34. In the study conducted, there were two screenshots used (see Exhibit D for the copies of the screenshots). The test condition screenshot was a copy of the actual FREECREDITREPORT.COM home page from February 20th, 2006.[16] The test screenshot included the mark as used on this website home page at the time of the original trademark application, as well as the detailed description of the credit monitoring services offered by Plaintiff.

---

[15] The names and phone numbers of all respondents were used for validation purposes and were not ever part of the record seen by me or my staff.

[16] This shot was retrieved from Archive.org accessed at http://www.archive.org/ on December 15th, 2009.

## The Control Stimuli

35. The possible existence of "background noise" (that is confusion caused by elements of the test that are not at issue for the false or misleading advertising claims) or demand effects may threaten the validity of the estimate found in the test condition. As a consequence, most false and misleading advertising studies also measure consumer perceptions in a control group to determine the level of confusion that is unrelated to the specific aspects of the advertising at issue.

36. In general, the control group stimulus should be designed such that the control stimulus ". . . shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[17]  For my work in this case, the key issue is whether the use of "free" in the mark and on the website is misleading consumers.  Therefore, the design of the control stimuli for the foregoing test condition is relatively straightforward. The appropriate control for this case is the same website home page with the word "free" removed. [18]

## Measures of Confusion in the Test and Control Conditions

37. The following protocol was used to estimate the percent of consumers misled in the test condition.  As explained above, respondents were asked to look at the webpage and identify what product or services were offered. For those respondents that indicated that the site offered "credit reports" or "credit scores", they were then asked whether the credit report did or did not have associated fees or obligations.  A respondent was

---

[17] Diamond, "Reference Guide" p. 258.

[18] For the control, the word "free" was left in the description of the free annual credit program associated with federal law.

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

counted as misled if he/she indicated that credit reports or scores were offered on the website and if he/she indicated that there were no fees and no obligations associated with the credit report.

38. The following protocol was used to estimate the percent of consumers misled in the control condition. As with the test condition, respondents were asked to look at the webpage and identify what product or services were offered. For those respondents that indicated that the site offered credit reports or credit scores, they were then asked whether the credit report did or did not have associated fees or obligations. A respondent was counted as misled if he/she indicated that credit reports or scores were offered on the website and if he/she indicated that there were no fees and no obligations. The actual confusion in the control condition is the background level of confusion caused by elements of webpage other than the use of the word "free".

## Results

39. For the test condition, there were a total of 195 completed interviews of which 38 percent were confused (74 respondents).

40. For the control condition, there were also a total of 195 completed interviews of which 19 percent were confused (37 respondents). This is the rate of "background noise" for the study. The data for both the control and test conditions are attached as Exhibit E.

41. The net rate at which consumers are misled or confused is typically calculated by subtracting the confusion rate found in the control condition from the confusion rate found in the test condition. This yields a net confusion rate of 19 percent (38 percent minus 19 percent) for this study.

//

## Review of Consumer Complaints

42. As noted above, I also reviewed a sample of complaints made to the Better Business Bureau. These complaints were filed in 2008 and 2009 and were made by consumers who were unhappy with some aspect of their experience with FREECREDITREPORT.COM and the services it offers.

43. I reviewed the comments made by consumers and find that a substantial proportion (i.e. as many as 40 to 50 percent of the sampled complaints) relates specifically to consumers' confusion as to the "free" nature of the services being offered. These complaints suggest consumers were often unaware that they had signed up for a monthly credit monitoring service and were unaware that when they requested a "free" credit report they had to cancel their membership after the trial period to avoid charges. The sampled complaints have been conditionally filed under seal as Exhibit F.

44. The comments made in the complaints provide additional evidence of actual confusion by consumers regarding the FREECREDITREPORT.COM mark and website.

## Conclusions

45. The study conducted was carefully designed to determine whether consumers are misled by the trademark FREECREDITREPORT.COM and its use on the FREECREDITREPORT.COM website. The study included an appropriate control to "net" out confusion caused by factors other than those that should be attributed to the mark FREECREDITREPORT.COM. After applying the controls, the study concluded that 19 percent of consumers are misled by the trademark FREECREDITREPORT.COM and its website. Based on these results and the procedures used to conduct these studies, I conclude

that there is reliable evidence that a significant portion of the relevant population is likely to be confused and/or misled that the credit report or credit score services offered by FREECREDITREPORT.COM do not have fees and obligations associated with them.

46. My opinions and conclusions as expressed in this declaration are to a reasonable degree of professional certainty. My work is ongoing and my opinions will continue to be informed by any additional material that becomes available to me.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 18, 2010.

_____
Kent D. Van Liere, Ph.D.